## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## FORT MYERS DIVISION

Dr. Arie Pablo Dosoretz, Dr. Amy Fox,
Dr. James H. Rubenstein, and
Dr. Michael J. Katin,

      Plaintiffs,

v.                                                                                  Civil Action No. 2:19-cv-00162

21st Century Oncology
Holdings, Inc.,
21st Century Oncology, LLC,
and 21st Century Oncology, Inc.

      Defendants.

_____/

## COMPLAINT

Dr. Arie Pablo Dosoretz, Dr. Amy Fox, Dr. James H. Rubenstein, and Dr. Michael J. Katin (collectively, "Plaintiffs") sue 21st Century Oncology Holdings, Inc., 21st Century Oncology, LLC, and 21st Century Oncology, Inc.  (collectively, "Defendants" or "21st Century Oncology") and state:

## PRELIMINARY STATEMENT

This is an action for improperly maintaining a monopoly over the provision of radiation oncology services in Collier, Lee, and Charlotte Counties in the state of Florida through extensive anti-competitive conduct in violation of federal antitrust laws.  This conduct has not only injured the Plaintiffs, radiation oncologists who wish to provide services in these three counties in competition with the Defendants, it has also injured elderly cancer patients, particularly patients suffering from prostate and breast cancer.  Defendants' anti-competitive conduct includes requiring the radiation oncologists who work for them in these three counties – the only radiation

oncologists in these counties – to sign onerous non-compete agreements that entirely prevent or sharply limit these doctors' ability to challenge Defendants' monopolist practice in these counties. It also includes creating strong incentives, financial and otherwise, for other physicians employed by the Defendants and who dominate the referrals for radiation oncology services in these three counties to refer their cancer patients who need radiation oncology services *only to* radiation oncologists employed by the Defendants.  It further includes two exclusive long-term contracts with key hospitals, conferring on Defendants a monopoly on the provision of radiation oncology services for patients at those hospitals.  Such conduct illegally perpetuates Defendants' monopoly, locks out competition, and enables Defendants to charge significantly inflated prices for the provision of radiation oncology services.  Plaintiffs seek an order declaring that Defendants' conduct violates Section 2 of the Sherman Act because their anti-competitive conduct serves to improperly perpetuate a monopoly and, in the alternative, because they have a dangerous probability of improperly achieving monopoly power.

In addition to their antitrust claims, the Plaintiff physicians also bring a series of claims for declaratory relief under state law, seeking an order declaring these non-compete agreements unenforceable because, *inter alia*, they serve to perpetuate an illegal monopoly or have a dangerous probability of doing so.  Absent relief from this Court, elderly and infirm cancer patients in Collier, Lee and Charlotte counties will face a critical shortage in access to radiation oncology services, and will often have to wait weeks or more for their radiation therapy to commence, with the potential in some cases for significant and even devastating adverse medical consequences and severe adverse psychological consequences in almost all cases as nervous cancer patients wait for their potentially life-saving treatment to begin.  In the alternative, each Plaintiff physician seeks a declaration that his or her non-compete agreement is not enforceable as drafted because it is overly

long, overly broad, or not reasonably necessary to protect a legitimate business interest of the Defendants.

## PARTIES

1.      Plaintiff Dr. Arie Pablo Dosoretz is a radiation oncologist employed by 21st Century Oncology, LLC.   Dr. Dosoretz attended medical school at the University of Pennsylvania and completed his specialty training in radiation oncology at Yale University where he was chief resident.  He is a resident of Florida.

2.      Plaintiff Dr. Amy Fox is a radiation oncologist employed by 21st Century Oncology, LLC.   Dr. Fox attended medical school at the Mount Sinai School of Medicine and completed her specialty training in oncology at the Harvard Radiation Oncology Program.  She is a resident of Florida.

3.      Plaintiff Dr. James H. Rubenstein is a radiation oncologist employed by 21st Century Oncology, LLC.  Dr. Rubenstein attended New York University School of Medicine and did his specialty training at the Hospital of the University of Pennsylvania where he was the chief resident in Radiation Oncology.  He is a resident of Florida.

4.      Plaintiff Michael J. Katin was a radiation oncologist employed by 21st Century Oncology, LLC. Dr. Katin attended medical school at the University of Pennsylvania School of Medicine.   He did his residency in radiation oncology  at the Harvard Radiation Oncology Program,  He also did a fellowship at Lankenau Hospital in Renal and Electrolyte Disorders, another fellowship at Roswell Park Memorial Institute in Medical Oncology, and a third fellowship at National Cancer Institute / National Institute of Health in Medical Oncology and Hematology. He is a resident of Florida.

5.      Defendant 21st Century Oncology Holdings, Inc. is a global provider of integrated cancer care services. A Delaware corporation, the company is headquartered in Fort Myers, Florida

and operates 167 treatment centers, including 131 centers located in 16 U.S. states, providing radiation oncology services for cancer patients. This Court has personal jurisdiction over 21st Century Oncology Holdings, Inc. pursuant to Section 48.193(1), Florida Statutes, as 21st Century Oncology Holdings, Inc. conducts business in this state, has an office in this state, and otherwise has sufficient minimum contacts with the state of Florida such that maintenance of this action in Florida does not violate traditional notions of fair play and substantial justice.

6.    Defendant 21st Century Oncology, LLC is a Florida limited liability company. The company operates multiple treatment centers in Florida including 11 radiation oncology centers in Collier, Lee, and Charlotte counties.

7.    21st Century Oncology, Inc. is a Florida corporation. The company operates (or has operated) multiple treatment centers in Florida including in Collier, Lee, and Charlotte counties.

## JURISDICTION AND VENUE

8.    Plaintiffs' claims for declaratory judgments regarding application of the Sherman Antitrust Act arise under Section 2 of the Sherman Antitrust Act, which is codified at 15 U.S.C. § 26, and under 28 U.S.C. § 2201.

9.    This Court has subject-matter jurisdiction over Plaintiffs' antitrust claims under 15 U.S.C. § 26; 28 U.S.C. §1331; and 28 U.S.C. §1337(a).

10.    The Court has personal jurisdiction over 21st Century Oncology because, *inter alia*, the Defendants: (a) transacted business throughout at least 16 states in the United States, including in this District; (b) provided services throughout much of the United States, including in this District; (c) had substantial contacts within the United States, including in this District; and/or (d)

were engaged in an unlawful restraint of trade which injured persons residing in, located in, or doing business throughout much of the United States, including in this District.

11.     Defendants engaged in conduct inside the United States that caused direct, substantial, and reasonably foreseeable and intended anticompetitive effects upon interstate commerce within the United States.  The activities of Defendants were within the flow of, were intended to, and did have, a substantial effect on interstate commerce of the United States. Defendants' services are sold in the flow of interstate commerce.

12.     Venue is proper in this District pursuant to §12 of the Clayton Act (15 U.S.C. §22) and 28 U.S.C. §1391(b)-(d), because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, a substantial portion of the affected interstate trade and commerce discussed herein has been carried out in this District, and Defendants reside in, are licensed to do business in, are doing business in, had agents in, or are found or transact business in, this District.

13.     Plaintiffs' claims for declaratory relief regarding the applicability of Florida Statute 542.335 arise under 28 U.S.C. § 2201.  The Court has jurisdiction over these claims under 28 U.S.C. § 1367(a).

14.     Venue is proper in this District under 28 U.S.C. §1391 for Plaintiffs' declaratory relief claims on the applicability of Florida Statute 542.335 because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District.  All Defendants do business in Florida, and the acts and practices alleged herein were committed in part in Florida, causing injury to Plaintiffs and third parties within Florida.  Venue is also proper under the venue provisions in the various non-compete agreements at issue.

## **FACTS**

### **Radiation Oncology and Cancer Patients**:

15.     Radiation oncology is a medical specialty that involves the controlled use of radiation to treat cancer either for cure, or to reduce pain and other symptoms caused by cancer. Radiation therapy is a method of treating cancer by carefully targeted and regulated doses of high-energy radiation to kill cancer cells.  Rapidly growing cells, such as cancer cells, are more susceptible to the effects of radiation therapy than are normal cells.  Radiation therapy can be used to treat a number of different types of cancer, including cancer of the bladder, brain, head and neck, lung, breast, prostate, skin, rectum, stomach, testicles, cervix and uterus, among others. It may also be used to combat lymphoma and sarcoma. Radiation therapy is common for treatment of prostate and breast cancer.

16.     Radiation therapy may be used to treat breast cancer at almost every stage. Radiation therapy is an effective way to reduce the risk of breast cancer recurring after surgery.  In addition, it is commonly used to ease the symptoms caused by cancer that has spread to other parts of the body (metastatic breast cancer).

17.     For prostate cancer, radiation therapy may be used: (1) As part of the first treatment (along with hormone therapy) for cancers that are either still confined to the prostate or have spread into nearby tissues and are either intermediate or high grade; (2) If the cancer is not removed completely or comes back (recurs) in the area of the prostate after surgery; and (3) if the cancer is advanced, to help keep the cancer under control for as long as possible and to help prevent or relieve symptoms.

18.     Patients who undergo radiation therapy usually have a course of treatment that lasts from three to nine weeks, depending on their diagnosis and other factors.  Typically, they receive radiation therapy five days a week for the duration of the course of treatment.

19.     One quarter of new cancer cases are diagnosed in people aged 65 to 74. The median age at diagnosis is 61 years for breast cancer, 68 years for colorectal cancer, 70 years for lung cancer, and 66 years for prostate cancer.

20.     Prostate cancer is the most common cancer among men, except for skin cancer. Prostate cancer is the second leading cause of cancer-related death in men in the United States.

21.      Prostate cancer mainly affects men over 50, and the risk increases as men get older. The average age for men to be diagnosed with prostate cancer is between 65 and 69 years.  About six cases in 10 are diagnosed in men aged 65 or older and very few are diagnosed before age 40.

22.     Breast cancer is the most common form of cancer to affect women, and incidence is growing, with about 1.7 million new cases worldwide every year.  In the United States alone, the National Cancer Institute (NCI) projects that 12.4 percent of women will develop breast cancer in their lifetime.

23.     The risk for breast cancer increases with age; most breast cancers are diagnosed after age 50. Of the women who are diagnosed with breast cancer in the United States each year, less than 3 percent of them are below the age of 40.  The median age that women get a breast cancer diagnosis is 62 years. The average age of death from breast cancer is 68.

24.     Prostate cancer and breast cancer are the two most common cancers that radiation oncologists treat.

25.     It is important for patients who have been diagnosed with cancer and prescribed a course of radiation therapy to receive that treatment promptly.  "[R]esearch has shown that a delay between the diagnosis and start of radiation therapy can reduce its effectiveness[.]"[1]  "Having

---

[1] UNIVERSITY OF TEXAS M.D. ANDERSON CANCER CENTER, DEMAND FOR RADIATION THERAPY PROJECTED TO OUTPACE SUPPLY OF RADIATION ONCOLOGISTS (Public Release Oct. 18, 2010).

sufficient access to radiation therapy is not just a matter of convenience for patients, but it can sometimes make a difference between effective radiation that will cure a patient versus suboptimal radiation that will not cure a patient."[2]

### **Product Market:**

26.     There are many types of cancer treatment.   A patient may receive medical monitoring, surgery, chemotherapy, hormone therapy, immunotherapy, radiation therapy, or a combination of different treatments.  The treatment recommended for a patient depends on the type of cancer the patient has and how advanced it is. Some people receive only one type of treatment. But many patients receive a combination of treatments, such as surgery with chemotherapy and/or radiation therapy.

27.     Radiation therapy and chemotherapy are two of the most common types of treatment for cancer.  While both are designed to effectively kill cancer cells, they are very different forms of treatment in terms of their process and effect on the body.  Radiation therapy and chemotherapy are sometimes complementary approaches for treating cancer patients, but they are not substitutes for one another except in rare circumstances involving a small percentage of patients.  For the overwhelming majority of patients, radiation therapy and chemotherapy are not substitutes; they are not fungible modes of treatment.

28.     Chemotherapy, or chemo, is a process in which drugs are used to treat cancer.  It is a "systemic" treatment — working through the whole body to prevent the spread of the disease.

---

[2] *Shortage of Radiation Oncologists May Be Looming*, ONCOLOGY TIMES, Vol. 32, Issue 23 (Dec. 10, 2010).

The drug(s) used will vary depending on the type and stage of cancer as well as the patient's age and health.  The goal of chemotherapy is to stop the spread of cancer to other parts of the body.

29.     Because chemotherapy drugs travel through the body, they can also impact healthy cells, leading to a variety of side effects.  The side effects of chemotherapy vary depending on the type and amount of chemotherapy drug used and how the body reacts to it.

30.     Chemotherapy is designed to kill fast-growing cancer cells, but can sometimes lead to side effects involving the body's other, healthy fast-growing cells.   Such side effects involve blood forming cells in the bone marrow (causing anemia, increased risk of infection, or bruising), the hair follicles (causing temporary hair loss) and cells in the mouth, and digestive and reproductive tract (causing nausea, loss of appetite, constipation, or diarrhea).  Some chemo drugs can damage cells in the heart, kidneys, bladder, lungs, and nervous system.

31.     Unlike chemotherapy, which usually exposes the whole body to cancer-fighting drugs, radiation therapy is typically a local treatment.  In most cases, it is aimed at and affects only the part of the body being treated.  Radiation therapy is planned to damage cancer cells, with as little harm as possible to nearby healthy cells.

32.     There are two basic types of radiation therapy: External Beam Radiation Therapy (EBRT) and Brachytherapy. With EBRT, the radiation is delivered from outside of the body using one of several different types of radiation systems. For patients undergoing Brachytherapy, a radioactive source is temporarily or permanently placed near the tumor site or in a cavity left by a tumor that has been surgically removed.

33.     While chemotherapy delivers drugs to the entire body, radiation therapy aims to reduce the amount of healthy cells that are lost during treatment by targeting only the areas of the body affected by the cancer.  Instead of killing the cells themselves, the radiation damages the

DNA of the target cells, which causes the cancer cells to die off.  While the treatment will affect the healthy cells surrounding the cancer cells as well, the healthy cells have the ability to heal themselves after treatment.  Radiation therapy differs from chemotherapy—it is used to treat just the tumor, so it affects only the part of the body that has cancer.

34.     For patients with private insurance, it is the insurance company that contracts with providers such as radiation oncologists and so determines whether they are part of the insurance company's network.  The insurance company pays the provider directly when an eligible insured receives services from the provider.  For the insured, it typically costs the same to see any doctor, including any radiation oncologist, in the network.  An insured can often choose to see an out-of-network radiation oncologist or other provider but then typically has a larger deductible and higher co-insurance.

35.     For patients with Medicare Advantage Plans, it is the Medicare Advantage Plan that contracts with providers such as radiation oncologists and so determines whether they are part of the plan's network.  The Medicare Advantage Plan pays the provider directly when an eligible insured receives services from the provider.

36.     For patients with a Medicaid managed care plan, it is the Medicaid managed care plan that contracts with providers such as radiation oncologists and so determines whether they are part of the managed care plan's provider network.  The Medicaid managed care plan pays the provider directly when an eligible insured receives services from the provider.

37.     The demand for radiation therapy is inelastic. In other words, an increase in price will lead to little or no decrease in demand because patients who need radiation therapy have nowhere to turn for an alternative, less expensive mode of treatment (or service) of similar quality

because there is no such alternative treatment.  For cancer patients, access to radiation therapy is often simply a matter of life or death.

38.     Radiation oncologists provide a series of closely related and integrated services, which are referred to as radiation oncology services, and collectively constitute the role of the radiation oncologist in treating patients with cancer.  In addition to supervising the provision of radiation therapy, the radiation oncologist also develops and prescribes the plan of treatment and makes sure that each dosage is given accurately.  The radiation oncologist tracks the patient's progress and adjusts the treatment as necessary and also identifies and treats any side effects that may occur due to radiation therapy.

39.     A hypothetical monopolist who enjoyed a monopoly over the provision of radiation oncology services would be able to impose a Small but Significant and Non-transitory Increase in Price  (hereinafter "SSNIP") on private insurance companies without losing so many sales to make the price increase not profitable and indeed would lose very few sales.

40.     A hypothetical monopolist who enjoyed a monopoly over the provision of radiation oncology services would be able to impose a SSNIP on Medicare Advantage Plans without losing so many sales to make the price increase not profitable and indeed would lose very few sales.

41.     A hypothetical monopolist who enjoyed a monopoly over the provision of radiation oncology services would be able to impose a SSNIP on Medicaid managed care plans without losing so many sales to make the price increase not profitable and indeed would lose very few sales.

42.     There are at least three closely related product markets:  (1) the sale of radiation oncology services to private insurance companies; (2) the sale of radiation oncology services to Medicare Advantage Plans; and (3) the sale of radiation oncology services to Medicaid managed

care plans. There are also closely related markets for the sale of radiation oncology services to the fee-for-service component of Medicare and Medicaid.

**Monopoly Power**:

43.     21st Century Oncology operates 11 radiation oncology centers in Collier, Lee, and Charlotte Counties.  There are no other radiation oncology centers in those counties.  21st Century Oncology employs 14 radiation oncologists in Collier, Lee, and Charlotte Counties.  It has five radiation oncologists in Collier County, which has a population of 372,880; eight in Lee County, with a population of 739,224; and two in Charlotte County, which has a population of 182,033. (One radiation oncologist works in both Lee and Charlotte counties).

44.     The following map shows the availability of radiation oncologists in Collier, Lee, and Charlotte Counties and also indicates whether those radiation oncologists are employed by the Defendants.



**Number of Radiation Oncologists by County**

**Geographic Market**:

45.     The course of radiation therapy typically runs five days a week, generally from three to nine weeks, but usually about six weeks.  Most patients in Collier, Lee, and Charlotte counties, given the duration of the course of treatment, have a very strong preference for receiving radiation oncology services within a short drive, typically no more than 20 to 30 minutes driving distance from their homes, regardless of whether the patients have Medicare, Medicaid, or private insurance.   Very few cancer patients in Collier, Lee, and Charlotte counties travel more than 30 minutes to receive radiation oncology services in these three counties.  Cancer patients almost always travel to the same location every time for treatment so they receive the same dosage of radiation therapy from the same machine.  Patients must be treated by the same machine after therapy begins.  The radiation oncologists provide care in the same office where patients are receiving their radiation therapy.

46.     Patients receiving radiation oncology services are often in their mid-60s or older and are frequently also suffering from other illnesses besides cancer, and their age and medical condition reinforce their desire to receive treatment close to home.  Many patients are driven to radiation oncology services by a family member or close friend, which furthers patients' strong preference for obtaining treatment close to home.  Some patients are simultaneously receiving chemotherapy treatment and are suffering the side effects of that treatment, making them even more anxious to receive radiation therapy close to the comforts of home.

47.     By both action and words, Defendants recognize the importance of having radiation oncology services within close proximity of their patients.  By deed, in recognition of patients' preference to receive radiation oncology services close to their homes, 21st Century Oncology operates 11 offices spread across Collier, Lee, and Charlotte counties, including two in Ft. Myers and four in Naples.  The addresses of 21st Century Oncology offices in those three counties are:

1419 SE 8th Terrace, Cape Coral, FL  33990

3680 Broadway, Ft. Myers, FL  33901

7341 Gladiolus Drive, Ft. Myers, FL  33908

8931 Colonial Center Drive, Suite 100, Ft. Myers, FL  33905

1120 Lee Boulevard, Lehigh Acres, FL  33936

8991 Brighton Lane, Bonita Springs, FL  34135

1885 SW Health PKWY, Naples, FL  34109

733 4th Avenue N., Naples, FL  34102

955 10th Avenue N., Naples, FL  34102

8350 Sierra Meadows Blvd., Suite 200, Naples, FL  34113

3175 Harbor Blvd., Port Charlotte, FL  33952

48.     The locations of 21st Century Oncology offices in Collier, Lee, and Charlotte counties are depicted on the following map.



49.     Similarly, by words, one of the tabs on 21st Century Oncology's web site is labeled "Close to Home", https://www.21co.com/, and states: "Our convenient treatment locations allow patients to fight cancer closer to home, so you can focus on your life, while we focus on treating your cancer."

50.     At the center of this three county region sits Lee County, which is the most populous of these three counties by a wide margin.  Much of the population in Lee County is clustered around the Fort Myers/Cape Coral/Lehigh Acres area and the population in the two neighboring counties is largely along the coast to the north in Charlotte County and to the south in Collier County.  By far the largest hospital in this three county area is Lee Memorial Hospital, in Lee County.

51.     Publicly available information shows that most residents in these three counties, when they go to the hospital, attend a hospital in this tri-county area, and also that relatively few individuals residing outside this tri-county area are hospitalized in a hospital in these three counties.  The following chart illustrates the relevant flow of general acute care patients.

**Inflow and outflow of hospital discharges from Charlotte, Collier, and Lee counties
By payer type, Q3 2017 through Q2 2018**

| Payer type | Inflow[1] | Outflow[2] |
|---|---|---|
| MEDICARE | 12% | 7% |
| MEDICAID | 7% | 5% |
| COMMERCIAL | 9% | 9% |
| SELF PAY | 9% | 7% |
| OTHER | 9% | 5% |

Source:  Florida AHCA Inpatient Data, Q3 2017 – Q2 2018.

Notes:
[1] Inflow is defined as the number of discharges from hospitals inside Charlotte, Collier, and Lee counties of patients residing outside those three counties divided by the total patients discharged by hospitals in those counties.

[2] Outflow is defined as the number of discharges from hospitals outside Charlotte, Collier, and Lee counties of patients residing inside those three counties divided by the total patients in those three counties discharged by any Florida hospital.

52.     While there is not publicly available information regarding how far patients would be willing to travel to receive radiation oncology services, it is nearly certain, given the foregoing clinical aspects of radiation oncology services and 21st Century Oncology's multiple locations,

that the vast majority of patients who need radiation oncology services would be willing to travel no farther than, and likely far less than, they would be willing to travel to obtain hospitalization services.

53.     On information and belief, significantly more than half of 21st Century Oncology patients receive radiation oncology services no more than 20 to 30 minutes driving distance from their homes.

54.     Given patients' pronounced preference for receiving radiation oncology services close to home, insurance companies, Medicare Advantage Plans, and Medicaid managed care plans all have a strong preference for including in their network radiation oncologists close to where their insureds reside.

55.     A hypothetical monopolist of all providers of radiation oncology services in Collier, Lee, and Charlotte Counties would be able to impose a SSNIP on private insurance plans without losing so many sales to make the price increase not profitable, and indeed would lose very few sales.

56.     A hypothetical monopolist of all providers of radiation oncology services in Collier, Lee, and Charlotte Counties would be able to impose a SSNIP on Medicare Advantage Plans without losing so many sales to make the price increase not profitable, and indeed would lose very few sales.

57.     A hypothetical monopolist of all providers of radiation oncology services in Collier, Lee, and Charlotte Counties would be able to impose a SSNIP on Medicaid managed care plans without losing so many sales to make the price increase not profitable, and indeed would lose very few sales.

58.     The geographic market for radiation oncology services on the Southwest Coast of Florida—whether for radiation oncology services purchased by Medicare, Medicare Advantage Plans, Medicaid, Medicaid managed care plans, or private insurance companies—is no larger than Collier, Lee, and Charlotte Counties.

**Pricing:**

59.     Many patients who receive radiation oncology services through 21st Century Oncology in Collier, Lee, and Charlotte Counties are on Medicare and for some of those patients, the price of the service they receive is set by Medicare.  However, for Medicare patients who are enrolled in a Medicare Advantage Plan, the price of services is set not through Medicare, but rather through negotiations between the particular Medicare Advantage Plan, and the doctor or group of doctors providing the services.

60.     Some patients are on Medicaid, and for some of those patients, the price of the service they receive is set by Medicaid.  However, for Medicaid patients who are enrolled in a Medicaid managed care plan, the price of services is set not through Medicaid, but rather through negotiations between the particular Medicaid managed care plan, and the doctor or group of doctors providing the services.

61.     Many other patients who receive radiation oncology services through 21st Century Oncology in these three counties are privately insured, and the rates 21st Century Oncology receives for the services provided at 21st Century Oncology are set by negotiations with the private insurers, often using the Medicare rates as a starting point for the negotiations.

62.     For Medicare Advantage Plans, Medicaid managed care plans, or private insurance plans, a provider with market power is able to impose a supra-competitive rate.

**Barriers to Entry and Anticompetitive Conduct:**

63.     Provision of radiation oncology services requires a sufficient number of highly-trained physicians and technicians.  It also requires expensive equipment and specialized facilities.

64.     A radiation therapy team is composed of a number of highly trained medical professionals led by a radiation oncologist.  Radiation oncologists have completed at least four years of college, four years of medical school, one year of general medical training and four years of residency (specialty) training in radiation oncology.  They have extensive training in cancer medicine and the safe use of radiation to treat disease.

65.     Medical physicists work directly with the radiation oncologist during treatment planning and delivery.  They oversee the work of the dosimetrist, who specializes in the characteristics and clinical relevance of radiation therapy machines and the absorption of radiation by the human body and ensures that complex treatments are properly tailored for each patient.  Medical physicists develop and direct quality control programs for equipment and procedures.  They also make sure the equipment works properly by taking precise measurements of the radiation beam and performing other safety tests on a regular basis.

66.     Dosimetrists work with the radiation oncologist and medical physicist to carefully calculate the dose of radiation to make sure the tumor gets enough radiation.  Using computers, they develop a treatment plan that can best destroy the tumor while sparing the healthy tissue.

67.     Radiation therapists work with radiation oncologists to give the daily radiation treatment under the doctor's prescription and supervision.  Radiation therapists also are in charge of the daily positioning and setup of patients to make sure they are in the correct position to receive the treatment plan designed by the radiation oncologist.   In addition, radiation therapists maintain daily records and regularly check the treatment machines to make sure they are working properly.

68.     To be most effective, radiation therapy must be aimed precisely at the same target or targets each and every time treatment is given.  The process of measuring the patient's body and marking the skin to help the team direct the beams of radiation safely and exactly to their intended locations is called simulation. During simulation, the radiation oncologist and radiation therapist place the patient on the simulation machine in the exact position the patient will be in during the actual treatment.  The radiation therapist, under the doctor's supervision, then marks the area to be treated directly on the patient's skin or on immobilization devices.  Immobilization devices are molds, casts, headrests or other devices that help the patient remain in the same position during the entire treatment.

69.     The radiation oncologist may request that special blocks or shields be made for the patient. These blocks or shields are put in the external beam therapy machine before each treatment and are used to focus the radiation to the area of the tumor and keep the rays from hitting normal tissue.

70.     A machine called a linear accelerator, or linac, which is the most commonly used machine for the provision of external radiation and typically costs $2-3 million or more, creates the radiation beam for x-ray or photon radiation therapy.  A radiation oncology center typically has several linear accelerators.  Special computer software adjusts the beam's size and shape.  This helps target the tumor while avoiding healthy tissue near the cancer cells.

71.     Radiation therapy equipment includes external beam treatment units (linear accelerators, Cobalt 60 machines, etc.), mold room equipment, immobilization and stabilization equipment, dosimetry and quality control equipment, conventional and CT simulators, treatment planning software and hardware, oncology information systems including R&V software, and brachytherapy treatment units and patient imaging systems.

72.     Not only are specially trained staff and equipment required for the provision of radiation oncology, but the building and rooms where the radiation oncology services are provided must be specially designed or retrofitted.  A linear accelerator can weigh anywhere from about 10,000 to 22,000 pounds, and one common machine weighs about 17,000 pounds, and so requires a building and room that has been designed to support that weight.  The linear accelerator must be housed in a room known as a vault, which is shielded with lead to protect others working nearby from exposure to harmful levels of radiation.

73.     Opening a new radiation oncology office can easily cost $8 million to $10 million. The cost of opening a new office and the need to provide the services of numerous specialists is a barrier to entry.

**Referrals**

74.     Referrals are the lifeblood of radiation oncologists and 21st Century Oncology established significant direct and indirect financial incentives for the medical doctors and surgeons it employs to refer their cancer patients who need radiation oncology services only or almost exclusively to 21st Century Oncology's own radiation oncologists, thereby improperly perpetuating its monopoly and locking competitors out of the market, in another barrier to entry. The medical specialists such as GYN/oncologists, urologists, and pulmonologists, and surgeons such as head and neck surgeons, ear, nose and throat surgeons, colorectal surgeons, breast surgeons, and general surgeons, practice "upstream" from the radiation oncologists.   In other words, such physicians typically see patients with cancer before the radiation oncologists do and so refer their cancer patients to the radiation oncologists who practice "downstream" from them. Without a fount of referrals, little or no stream of cancer patients would reach the radiation oncologists.

75.     For instance, patients with prostate cancer are frequently referred to a radiation oncologist by their urologist.  Patients with breast cancer are often referred to radiation oncologists by their breast surgeons.

76.     Though it is generally illegal under the Stark Law to pay doctors for referring patients to other doctors, it is permissible to create a pool for referring doctors who refer patients to other physicians within the same group provided the pool is not allocated among the referring doctors on the basis of the number of referrals and provided certain other conditions are met.  For instance, if 10 urologists working for 21st Century Oncology refer patients with prostate cancer to radiation oncologists at 21st Century Oncology, the referring urologists could, if certain other conditions were met, each receive 1/10 or 10% of a pool created for the urologists who refer prostate cancer patients to radiation oncologists at 21st Century Oncology.

77.     On information and belief, 21st Century Oncology has created such a bonus pool for urologists and through that pool 21st Century Oncology has created very substantial financial incentives for its urologists to refer patients with prostate cancer to radiation oncologists at 21st Century Oncology and effectively created a substantial financial penalty for 21st Century Oncology urologists if they do not do so.

78.     On information and belief, 21st Century Oncology has created incentives for other medical doctors and surgeons at 21st Century Oncology to refer their cancer patients to radiation oncologists at 21st Century Oncology.  Sometimes that incentive takes the form of creating a bonus pool whereby doctors at 21st Century Oncology who refer their patients for assorted diagnostic radiology or imaging tests at 21st Century Oncology are entitled to participate in the imaging pool, which is funded through a percentage of the profits of all the imaging done at 21st Century Oncology.  Sometimes it takes the form of paying physicians at 21st Century Oncology a salary in

excess of what they could earn in the market place.  Sometimes it takes the form of paying other doctors to take the on-call responsibilities of 21st Century Oncology surgeons at local hospitals where the 21st Century Oncology surgeons must agree to be on call to handle any surgical emergencies at certain set intervals.  That is a duty many surgeons do not like because of the unpredictable and late hours and because it may require them to handle appendectomies and other types of surgery that they may not have performed since they completed their training, sometimes decades ago.  Sometimes it takes the form of multiple incentives.

79.     As a result of these various pools and incentives, there is significant pressure for other upstream medical doctors and surgeons to refer their cancer patients to the radiation oncologists at 21st Century Oncology.  The executives at 21st Century Oncology who set the other physicians' terms of employment including their salaries, their eligibility for various types of bonuses and other incentives, know or can readily determine to whom the other physicians refer their cancer patients for radiation oncology services..

80.     21st Century Oncology presently employs all or most of the medical doctors or surgeons in Collier, Lee, and/or Charlotte Counties in various upstream specialty areas, further solidifying its monopoly and locking competitors out of the market.    There are four GYN/oncologists in this tri-county area.  All four are employed by 21st Century Oncology.  There is one surgeon specialized in oncologic head and neck surgery in this tri-county county area.  He is employed by 21st Century Oncology.  There are seven breast surgeons in this tri-county area and all but one work for 21st Century Oncology. There is one ENT cancer surgeon in these three counties, and that surgeon is employed by 21st Century Oncology.    There are four certified colorectal surgeons in Lee County, and all four work for 21st Century Oncology.

**Acquisitions and Exclusive Contracts:**

81.     21st Century Oncology has an exclusive contract for the provision of radiation oncology services both with Lee Memorial Health System, the only hospital system in Lee County, and with Naples Community Hospital ("NCH"), the dominant hospital in Collier County.

82.     Under its exclusive contract with Lee Memorial Health System, every time a patient at Lee Memorial Health System needs a consult with a radiation oncologist, that consult is referred to a radiation oncologist at 21st Century Oncology.  Those consults are an important and constant source of referrals, further perpetuating 21st Century Oncology's monopoly and locking out the competition in another barrier to entry, because upon discharge, patients will typically see the same radiation oncologists who did the consult while the patient was hospitalized.

83.     While patients typically receive radiation oncology services on an outpatient basis, it is unfortunately a common occurrence for cancer patients receiving radiation therapy, who are often elderly and sick, to require hospitalization during the course of their multi-week radiation therapy.  When that happens, the radiation oncologist helps care for the patient while the patient is hospitalized.  But under the exclusive contract between Lee Memorial Health System and 21st Century Oncology, a radiation oncologist who is not part of the 21st Century Oncology, would, not be permitted to treat his or her patient while the patient was hospitalized.   Such a contractual prohibition is both an improper means of perpetuating 21st Century Oncology's monopoly and a barrier to entry for potential competitors.

84.     In conjunction with Lee Memorial Hospital and Florida Cancer Society, 21st Century Oncology operates a Regional Cancer Center, near Lee Memorial Hospital, where cancer patients can see various specialists in one visit because they all have offices at the same location. 21st Century Oncology leases space at the Regional Cancer Center to provide radiation oncology services, and no one else can provide such services at that center.

85.     In about 2008/09, 21st Century Oncology purchased a radiation oncology clinic from NCH.  21st Century Oncology continues to operate the clinic in a building owned by the hospital and across the street from the hospital.  21st Century Oncology provides out-patient radiation oncology services in the clinic where it has a linear accelerator.

86.     Part of the condition of the 2008/09 purchase was a contractual provision stating that NCH could not compete with 21st Century Oncology in the provision of radiation oncology services.  On information and belief, that contract also provides that all oncology referrals for patients hospitalized at Naples Community Hospital will be sent to doctors at 21st Century Oncology and that only radiation oncologists from 21st Century Oncology would have privileges at NCH.  That means that if there were another radiation oncologist whose patient was hospitalized at NCH during the course of the radiation treatment, that radiation oncologist could not take care of his or her patient while the patient was hospitalized.  Again, those contractual provisions both improperly perpetuate 21st Century Oncology's monopoly and help lock out competitors.

87.     In October 2013, 21st Century Oncology closed on its $125 million acquisition of OnCure Holdings, Inc., which together with its subsidiaries, comprised 33 radiation oncology centers and 11 radiation oncology physician groups in Florida, California and Indiana.  One of Oncure's radiation oncology centers was in Charlotte County.  Following the purchase, 21st Century Oncology no longer had any competition from other radiation oncologists in Charlotte County.

88.     In about 2014, 21st Century Oncology bought a group of urologists called Specialists in Urology.  That urology group had started hiring its own radiation oncologists and referring its prostate cancer patients to its own in-house radiation oncologists, but was struggling financially, and on information and belief, was losing money.  By purchasing Specialists In

Urology, 21st Century Oncology eliminated a competitor in the provision of radiation oncology services.

**Non-Compete Agreements:**

89.     There are presently 14 oncologists working for 21st Century Oncology in Collier, Lee, and Charlotte Counties, and 21st Century Oncology required all of them to sign a covenant not to compete, or non-compete agreement, as a condition of their employment. Because those non-compete agreements are frequently multi-year in duration and often cover the entire counties of Lee, Collier, and Charlotte, the non-compete agreements prevent almost all of 21st Century Oncology's current radiation oncologists from going into competition with 21st Century Oncology in those counties, and often in far broader areas as well, and create another barrier to entry

90.     On or about February 3, 2015, Dr. Arie Pablo Dosoretz entered into a Physician's Employment Agreement with 21st Century Oncology, LLC ("Employment Agreement")[3], and simultaneously with the execution and delivery of the Employment Agreement, Dr. Dosoretz entered into a Non-Competition and Confidentiality Agreement with 21st Century Oncology, LLC ("Noncompetition Agreement"), which was incorporated by reference into the Employment Agreement. The agreements provide for venue in any state or federal court having jurisdiction over Lee County, Florida.  The restrictions in the Noncompetition Agreement run for 24 months following the termination of Dr. Dosoretz's employment for any reason.  The geographic scope of the prohibition in the Noncompetition Agreement extends to (i) Lee, Collier, and Charlotte Counties, Florida and (ii) a twenty (20) mile radius of each of the Employer's radiation oncology centers located at: (x) the Offices as such term is defined in the Employment Agreement, (y) any

---

[3] The Employment Agreement was amended by the parties' Amendment to Letter Agreement, entered into as of April 1, 2017, and Amendment to Physician's Employment Agreement effective as of July 1, 2018, and a Third Amendment to Physician's Employment Agreement, effective as of December 31, 2018.

other offices or locations where the Physician provides or provided professional or administrative services on behalf of the Employer; and (z) any hospital where Physician provides services on behalf of Employer.

91.     Under the Noncompetition Agreement Dr. Dosoretz is not permitted to:

a.     engage in the ownership, operation or management of radiation oncology facilities or otherwise engage in the provision of radiation oncology services (whether as a separate business or in conjunction with any practice or other medical services provider and whether at a hospital or elsewhere) (a "Competing Business").

b.     have any interest, whether as owner, stockholder, member, partner, director, officer, employee, consultant or otherwise, in any Competing Business within the Service Area.

c.     counsel, solicit, or attempt to induce any 21st Century Oncology employee to terminate employment or retention.

d.     employ any person employed by 21st Century Oncology.

e.     provide radiation oncology medical services of any kind to any patient referred to him, or to his new employer, by any person that referred five (5) or more patients to 21st Century Oncology during the twelve (12) months immediately preceding the end of his employment with 21st Century Oncology.

f.     provide radiation oncology medical services of any kind to any patient treated by 21st Century Oncology in the twenty-four (24) months immediately preceding the end of his employment with 21st Century Oncology.

The Noncompetition Agreement states that the restrictions contemplated by subsections (a), (e) and (f) above shall not prohibit Physician from providing emergency medical treatment.

92.     On or about April 16, 2009, Dr. Amy Fox entered into a Physician's Employment Agreement with 21st Century Oncology, LLC ("Fox Employment Agreement")[4] and subsequently on May 1, 2009, entered into a Non-Competition and Confidentiality Agreement ("Fox Noncompetition Agreement"), which was incorporated by reference into the Employment Agreement with 21st Century Oncology, LLC and Radiation Therapy Services, Inc., as 21st Century Oncology Inc. was formerly known. The agreements provide for venue in any state or federal court having jurisdiction over Lee County, Florida.   The restrictions in the Fox Noncompetition Agreement run for 12 months following the termination of Dr. Fox's employment for any reason.   The list of prohibited activities is the same for Dr. Amy Fox as for Dr. Arie Dosoretz.   The geographic scope of the prohibitions extends to twenty (20) miles of Employer's radiation oncology treatment office located at: (i) 419 SE 8th Terr., Cape Coral, FL; 3680 Broadway, Ft. Myers, FL; (ii) 7341 Gladiolus Dr., Ft. Myers, FL; (iii) 8931 Colonial Blvd., Suite 100, Ft. Myers, FL; (iv) 1120 Lee Blvd., Lehigh Acres, FL; or any other offices where the Physician provides or provided services on behalf of the Employer (the "Service Area").

93.     On or about February 21, 2008, Dr. James H, Rubenstein and 21st Century Oncology, Inc., (n/k/a 21st Century Oncology, LLC) entered into a Physician Employment Agreement, which was amended on March 21, 2010 by that certain Amendment to Employment Agreement, and again on September 24, 2014, by the parties' Second Amendment to Physician Employment Agreement (collectively hereinafter referred to as the "Rubenstein Employment Agreement").   The Rubenstein Employment Agreement provides that the parties submit to

---

[4] The Fox Employment Agreement was amended by the parties' First Amendment to Physician's Employment Agreement, dated September 25, 2009, the Second Amendment to Physician's Employment agreement effective April 16, 2009, and the Third Amendment to Physician's Employment Agreement, effective June 19, 2012.

jurisdiction in any court of competent jurisdiction in Florida.  The non-compete provisions in the Rubenstein Employment Agreement run for three years after termination of the agreement.  The geographic scope of the restrictions in the Rubenstein Employment Agreement extend to: 1. At any hospital in which 21st Century Oncology physicians regularly admit patients; 2. Any county in which 21st Century Oncology or its affiliates operate a Center; 3. A radius of twenty-five (25) miles of any 21st Century Oncology location providing radiation oncology services.  Under the Rubenstein Employment Agreement, Dr. Rubenstein is prohibited from directly or indirectly engaging in the practice of radiation therapy or oncology or otherwise competing with 21st Century Oncology by practicing as a radiation therapist or oncologist.  There is an exception to the non-compete that specifies that Dr. Rubenstein may, notwithstanding the non-compete, engage in the practice of medicine, individually or as part of a group practice of five (5) or less radiation oncologists following the termination or expiration of the Agreement; provided, that neither the individual nor group practice (i) has affiliated relationships with any other physician practices or (ii) has more than one geographic location.

94.     On or about February 21, 2008, Dr. Michael J. Katin and 21st Century Oncology, Inc. (n/k/a 21st Century Oncology, LLC) entered into a Physician Employment Agreement, which was amended by an Amendment to Employment Agreement effective March 1, 2010, a Second Amendment to Physician Employment Agreement effective August 10, 2014, and a Third Amendment to Employment Agreement effective July 1, 2018 (collectively the "Katin Employment Agreement").  Under the non-compete provision in the Katin Employment Agreement, Dr. Katin is prohibited from engaging in the practice of radiation therapy or oncology or engaging in any business activity competitive with 21st Century Oncology. The non-compete provision runs for three years after the termination of the Katin Employment Agreement, with a

geographic scope that extends to: 1. At any hospital in which 21st Century Oncology physicians regularly admit patients; 2. Any county in which 21st Century Oncology or its affiliates operate a Center; or 3. A radius of twenty-five (25) miles of any 21st Century Oncology location providing radiation oncology services.

**Intent to Monopolize:**

95.     Defendants' present exclusionary conduct—including the creation and continued maintenance of a lucrative referral pool for their urologists, the creation of financial incentives for the other physicians Defendants employ to make referrals to radiation oncologists working at 21st Century Oncology, Defendants' exclusive contracts with Lee Memorial Hospital and NCH, Defendants' purchase of their competitors, and the onerous non-compete agreements Defendants entered into with their radiation oncologists—all evidence Defendants' specific intent to monopolize the market for the provision of radiation oncology services to Medicare, Medicare Advantage Plans, Medicaid, Medicaid managed care plans, and private insurance plans in this tri-county area.

**Quality of Care and Reputational Harm:**

96.     21st Century Oncology is presently engaging in a number of different practices that have and continue to degrade the quality of care that it is providing and that threatens to harm their professional reputations because they are necessarily associated with the conduct of 21st Century Oncology.

97.     For instance, upon information and belief, to improve its bottom line, 21st Century Oncology has reduced the budget and funding available for experienced nurses and technicians, even though that has reduced the number of experienced nurses and technicians (because they have left) and adversely impacted the quality of patient care.  21st Century Oncology has also moved,

in certain instances, to pay doctors per patient treated and has not guaranteed income for experienced radiation oncologists, causing experienced doctors to leave.

98.     The problems extend to the physical plant.  The sanitation system in the Port Charlotte office overflowed during 2018, and months later, the office has still not been fully repaired and a stench lingers.

99.     The problems extend to personnel issues as well.  21st Century Oncology recently brought in a new chief operating officer, who lasted a few weeks in the job.

**Prospective Market Entrants:**

100.     Drs. Dosoretz, Fox, Rubenstein, and Katin are desirous of providing radiation oncology services in Collier, Lee, and Charlotte Counties, in competition with 21st Century Oncology and have already taken a number of steps in preparation of doing so.

101.     Among other steps, they have determined where they would open their first offices; prepared a detailed business plan, including costs and patient loads necessary to break even and then make a profit; determined what equipment they need to order, where to order it, and how much it would cost; prepared a staffing plan; determined how they would fund their start-up expenses; and retained an architect to prepare drawings for renovating their proposed office.

## COUNT I

**Declaratory Judgment Regarding Monopolization in Violation of the Sherman Act**

102.     Plaintiffs repeat and reallege paragraphs 1 through 101 hereof, as if fully set forth herein.

103.     This is a declaratory judgment count brought under Section 2 of the Sherman Antitrust Act, which is codified at 15 U.S.C. § 26, and under 28 U.S.C. § 2201 and 28 U.S.C. §

2202 for the purpose of determining an actual controversy among the parties with regard to whether Defendants' conduct violates Section 2 of the Sherman Act.

104.    Plaintiffs believe that Defendants' conduct violates Section 2 of the Sherman Act because Defendants have improperly maintained a monopoly on the provision of radiation oncology services to Medicare, Medicare Advantage Plans, Medicaid, Medicaid managed care plans, and private insurance plans and that their conduct should be declared illegal.  Defendants believe they are operating consistent with federal law.

105.    Defendants control 100 percent or nearly 100 percent of the market for the provision of radiation oncology services to Medicare, Medicare Advantage Plans, Medicaid, Medicaid managed care plans, and private insurance plans in Collier, Lee, and Charlotte Counties.

106.    Even if (1) Dr. Rubenstein practices in one location in the three county area, which he may do under the exception to his non-compete, provided he complies with certain other provisions in the Rubenstein Employment Agreement, (2)  Dr. Fox practices in a location in the three country area which she may do consistent with her non-compete if she complies with certain other provisions in the Fox Noncompetition Agreement, and (3) another radiation oncologist working for 21st Century Oncology practices in one location as he may do under his non-compete agreement provided he complies with certain other provisions, 21st Century Oncology would still employ more than 78% of the radiation oncologists in these three counties.

107.    Moreover, the limited exception or carve-out in the Rubenstein Employment Agreement provides that even if Dr. Rubenstein is practicing in a single office with no more than five radiation oncologists, he or his physician group or practice may not have "affiliated relationships with any other physician practices[.]"  If that phrase is interpreted to mean he cannot practice in a group that employs doctors other than radiation oncologists, that carve-out is illusory

because it is not possible to compete against 21st Century Oncology in a group composed solely of radiation oncologists.

108. Presently, Defendants are willfully maintaining their monopoly through exclusionary conduct including:

a. requiring all radiation oncologists working in these three counties to sign onerous agreements not to compete;

b. financially incentivizing their in-house urologists to make referrals exclusively to radiation oncologists at 21st Century Oncology and effectively punishing them through loss of bonuses for referring patients to radiation oncologists not working for 21st Century Oncology;

c. pressuring other medical doctors, including GYN/oncologists and breast surgeons, among other types of physicians, at 21st Century Oncology to make only in-company referrals for radiation oncology services by the provision of bonuses, enhanced salaries or other incentives;

d. having an anti-competitive, exclusionary contract with Lee Memorial Health systems;

e. having an anti-competitive exclusionary contract with Naples Community Hospital; and

f. buying out competitors.

109. As a result of Defendants' present exercise of their monopoly power, competition has been stifled. Insurance companies, Medicare Advantage Plans, referring doctors and patients all have less choice about where to access radiation oncology services. Similarly, the price of radiation oncology services in these three counties has been artificially and significantly inflated

for patients on private insurance, Medicare Advantage Plans, and Medicaid managed care plans as a result of the lack of competition.

110.     But for Defendants' anticompetitive conduct, Drs. Dosoretz, Fox, Rubenstein, and Katin would have entered the market for provision of radiation oncological services in Collier, Lee, and Charlotte counties sooner and as a result of their competition, there would have been more choice for insurance companies, Medicare Advantage plans, and Medicaid managed care plans about where to access radiation oncology services in these three counties and fees for such services would have been lower.  Furthermore, referring physicians would have had more choices about where to send their patients.

WHEREFORE, Plaintiffs seek a declaration finding that Defendants have violated Section 2 of the Sherman Act and that Defendants' conduct, specified in paragraphs 74-99, is in violation of the Sherman Act.  Plaintiffs also seek reasonable attorneys' fees, court costs, interest, and any other relief this Court deems proper.

## COUNT II

### Declaratory Judgment Regarding Attempted Monopolization
### In Violation of the Sherman Act

111.     Plaintiffs repeat and reallege paragraphs 1 through 101 hereof, as if fully set forth herein.

112.     This is a declaratory judgment count brought under Section 2 of the Sherman Antitrust Act, which is codified at 15 U.S.C. § 26, and under 28 U.S.C. § 2201 and 28 U.S.C. § 2202 for the purpose of determining an actual controversy among the parties with regard to whether Defendants' conduct violates Section 2 of the Sherman Act.

113.     Plaintiffs believe that Defendants' present conduct violates Section 2 of the Sherman Act because Defendants have attempted to monopolize the market for provision of

radiation oncology services to Medicare, Medicare Advantage Plans, Medicaid, Medicaid managed care plans, and private insurance plans and that their conduct should be declared illegal. Defendants believe they are operating consistent with federal law.

114.    Defendants control 100 percent or nearly 100 percent of the market for provision of radiation oncology services to insurance companies, Medicare, Medicare Advantage Plans, Medicaid, and Medicaid managed care plans in Collier, Lee, and Charlotte Counties.

115.    Even if (1) Dr. Rubenstein practices in one location in the three county area, which he may do under the exception to his non-compete, provided he complies with certain other provisions of the Rubenstein Employment Agreement, (2) Dr. Fox practices in a location in the three country area which she may do consistent with her non-compete if she complies with certain other provisions in the Fox Noncompetition Agreement, and (3) another radiation oncologist working for 21st Century Oncology practices in one location as he may do under his non-compete agreement provided he complies with certain other provisions, 21st Century Oncology would still employ more than 78% of the radiation oncologists in these three counties.

116.    Defendants presently hold a dominant position in the market for the provision of radiation oncology services to Medicare, Medicare Advantage Plans, Medicaid, Medicaid managed care plans, and private insurance plans in Collier, Lee, and Charlotte Counties and if they have not already monopolized the market, they have a dangerous probability of success in doing so.

117.    Moreover, the limited exception or carve-out in the Rubenstein Employment Agreement provides that even if Dr. Rubenstein is practicing in a single office with no more than five radiation oncologists, he or his physician group or practice may not have "affiliated relationships with any other physician practices[.]"  If that phrase is interpreted to mean he cannot

practice in a group that employs doctors other than radiation oncologists, that carve-out is illusory because it is not possible to compete against 21st Century Oncology in a group composed solely of radiation oncologists.

118.    Presently, Defendants are engaged in exclusionary conduct, evidencing their specific intent to monopolize the market, including the following conduct:

a.  financially incentivizing their in-house urologists to make referrals exclusively to radiation oncologists at 21st Century Oncology and effectively punishing them through loss of bonuses for referring patients to radiation oncologists not working for 21st Century Oncology;

b.  pressuring other medical doctors, including GYN/oncologists and breast surgeons, among other types of physicians, at 21st Century Oncology to make only in-company referrals for radiation oncology services by the provision of bonuses, enhanced salaries or other incentives;

c.  pressuring other medical doctors and surgeons at 21st Century Oncology to make only in-company referrals for radiation oncology services;

d.  having an anti-competitive, exclusionary contract with Lee Memorial Health systems;

e.  having an anti-competitive exclusionary contract with Naples Community Hospital; and

f.  buying out competitors.

119.    As a result of Defendants' present conduct, they have a dangerous probability of being able to monopolize the market for radiation oncology services in Collier, Lee, and Charlotte Counties and stifle competition, undermining any choice provided to insurance companies,

Medicare, Medicare Advantage Plans, Medicaid, Medicaid managed care plans, referring doctors and patients about where to access radiation oncology services, and ensuring that the price of radiation oncology services in these three counties will be artificially and significantly inflated for patients on Medicare, Medicare Advantage Plans, Medicaid, Medicaid managed care plans, and private insurance plans.

120.    But for Defendants' anticompetitive conduct, Drs. Dosoretz, Fox, Rubenstein, and Katin would have entered the market for provision of radiation oncological services in Collier, Lee, and Charlotte Counties sooner and as a result of their competition, there would have been more choice for insurance companies, Medicare, Medicare Advantage plans, Medicaid, and Medicaid managed care plans about where to access radiation oncology services in these three counties and fees for such services would have been lower.  Furthermore, referring physicians would have had more choices about where to send their patients.

WHEREFORE, Plaintiffs seek a declaration finding that Defendants have violated Section 2 of the Sherman Act by attempting to monopolize the market and that Defendants' conduct, specified in paragraphs 74-99, is in violation of the Sherman Act.  Plaintiffs also seek reasonable attorneys' fees, court costs, interest, and any other relief this Court deems proper.

## COUNT III

### Declaratory Judgment under Fla. Stat. 542.335 as to Drs. Dosoretz, Fox, Rubenstein, and Katin

121.    Plaintiffs repeat and reallege paragraphs 1 through 101 hereof, as if fully set forth herein.

122.    This is a declaratory judgment count brought under 28 U.S.C. § 2201 and 28 U.S.C. § 2202 for the purpose of determining an actual controversy among the parties with regard to the enforceability of restrictive covenants running against Drs. Dosoretz, Fox, Rubenstein, and Katin.

37

Plaintiffs believe the restrictive covenants at issue are not enforceable and seek a final judgment declaring these covenants are not enforceable.

123.    Based on all the facts and allegations as incorporated herein, an actual, present and existing controversy exists between the parties hereto as to the enforceability of the specified restrictive covenants.  This Court's declaration will confer certainty on the parties with respect to their rights, duties and obligations under the specified restrictive covenants.

124.    Plaintiffs believe the restrictive covenants at issue are not presently enforceable for multiple reasons.  First, a person seeking enforcement of a restrictive covenant must prove the existence of one or more legitimate business interests justifying the restrictive covenant. Fla. Stat. § 542.335(1)(b). Plaintiffs contend the restrictive covenants at issue, which prohibit the physicians from practicing in the three counties in question or sharply limit where they can practice, serve to unlawfully perpetuate a monopoly enjoyed by 21st Century Oncology in the provision of radiation oncology services in Collier, Lee, and Charlotte Counties and so are not justified by a legitimate business interest of 21st Century Oncology.   Regardless of what business purpose or interest these non-competes may purport to serve, they cannot serve a legitimate business purpose because they perpetuate a monopoly.

125.    Second, cancer patients are typically referred to a particular radiation oncologist, not to 21st Century Oncology, and thus such referrals do not constitute "legitimate business interests" of 21st Century Oncology sufficient to support the restriction on competition.  Thus, these agreements are not enforceable insofar as their enforcement allegedly serves to protect 21st Century Oncology's interest in the source of referrals.

126.    Third, anyone seeking to enforce such a covenant "must plead and prove the contractually specified restraint is reasonably necessary to protect the legitimate business interest

or interests justifying the restriction." Fla. Stat. § 542.335(1)(c).  Even assuming the restrictive covenants are justified by a legitimate business interest, Plaintiffs believe they are not necessary to protect that interest, which could be adequately protected by restrictive covenants that were sharply limited in temporal and geographic scope, especially because these broad non-compete agreements unlawfully perpetuate 21st Century Oncology's monopoly on the provision of radiation oncology services in Collier, Lee, and Charlotte counties.

127.    Fourth, under certain circumstances a court may refuse enforcement of an otherwise enforceable restrictive covenant on public policy grounds if the public policy requirements substantially outweigh the need to protect the legitimate business interest or interests established by the person seeking enforcement of the restraint.  Here, the enforcement of the restrictive covenants would lead to a critical shortage of radiation oncologists, to the detriment of cancer patients, including many elderly patients with prostate or breast cancer, in Collier, Lee, and Charlotte Counties, who need daily radiation therapy for a number of weeks.  It would also lead to significant delays of weeks or more before cancer patients in Collier, Lee, and Charlotte Counties would be able to start their radiation therapy treatment, with potentially significant and even catastrophic adverse medical consequences in some cases and significant psychological consequences in almost all cases.

128.    Five radiation oncologists currently practice in Collier County.  Eight currently practice in Lee County, and three in Charlotte County.  Four of the doctors who practice in Lee County, and one of the doctors who practice in Charlotte County are plaintiffs in this action, challenging the enforceability of their non-compete agreement.[5]  Together, they represent four of

---

[5] Dr. Katin and another radiation oncologist employed by 21st Century Oncology practice in both Lee and Charlotte counties.

the fourteen radiation oncologists practicing in the three country area, 50% of the radiation oncologists practicing in Lee County and 33.3% of the radiation oncologists practicing in Charlotte County.   If they are not able to practice because of their non-compete agreements, there will be a critical shortage of physicians to provide timely radiation oncology services to cancer patients in these counties, a critical access to care problem, and significant delays in the commencement of radiation oncology services, including radiation therapy, therapy for cancer patients, many of whom are elderly and have difficulty traveling any substantial distance for five-day-a-week radiation oncology.

129.    Only three of the 14 radiation oncologists in Collier, Lee, and Charlotte Counties speak Spanish.   Dr. Dosoretz and Dr. Fox are two of the three Spanish-speaking radiation oncologists in those counties.   If they are prohibited from practicing or sharply limited in where they can practice, Spanish-speaking cancer patients who prefer a physician who can speak to them in their native tongue will suffer as a result.

130.    Defendants contend that the restrictive covenants are enforceable.   Thus, based on all the facts and allegations as incorporated herein, an actual, present and existing controversy has arisen between the parties hereto as to whether the restrictive covenants serve a legitimate business interest and are necessary to protect a legitimate business interest as well as whether any legitimate interest is substantially outweighed by countervailing public policy considerations.

WHEREFORE, Plaintiffs seek a declaration finding that the restrictive covenants of Drs. Drs. Dosoretz, Fox, Rubenstein, and Katin are not enforceable under Florida Statute 542.335 because they do not serve a legitimate business purpose, are not necessary to serve such a purpose, and are against public policy because their enforcement would lead a critical access to care

shortage for elderly cancer patients in Collier, Lee, and Charlotte Counties.  Plaintiffs also seek reasonable attorneys' fees, court costs, interest, and any other relief this Court deems proper.

**COUNT IV**

**<u>Declaratory Judgment under Fla. Stat. 542.335 as to Dr. Dosoretz</u>**

131.    Plaintiffs repeat and reallege paragraphs 1 through 101 hereof, as if fully set forth herein.

132.    This is a declaratory judgment count brought under 28 U.S.C. § 2201 and 28 U.S.C. § 2202 for the purpose of determining an actual controversy among the parties regarding whether the restrictive covenants in Dr. Dosoretz's Noncompetition Agreement are overbroad, overlong and not reasonably necessary to protect legitimate interests.  Fla. Stat. § 542.335(1)(c).

133.    Plaintiffs believe the covenant not to compete against Dr. Dosoretz in the Noncompetition Agreement is presently overbroad and not reasonably necessary to protect any legitimate business interest of 21st Century Oncology and, therefore, is not enforceable as written. Defendants believe it is enforceable.

134.    Dr. Dosoretz has provided radiation oncology care to patients in Lee County only, yet the covenant-not-to-compete in his Noncompetition Agreement improperly prohibits him from providing radiation oncology care in Collier, Lee, and Charlotte counties.  Because that prohibition far exceeds the area in which he has practiced radiation oncology with Defendants, Plaintiffs believe that broad prohibition is unenforceable.

135.    The fact that the non-competition provision in the Rubenstein Employment Agreement has an exception or carve-out allowing Dr. Rubenstein to practice radiation oncology in one location of his own choosing, provided he does not practice with more than four other radiation oncologists and certain other conditions are met, demonstrates there is no legitimate

business justification for a blanket prohibition on where Dr. Dosoretz can practice and that there should, at a minimum, be a carve-out allowing him to practice in at least one location as well.

136.   The prohibition in Dr. Dosoretz's Noncompetition Agreement extends beyond those three counties to a 20-mile radius of any 21st Century Oncology office or location where Dr. Dosoretz has provided professional or administrative services on behalf of the employer.  Dr. Dosoretz has served as Clinical Director of Physician Recruitment at 21st Century Oncology.  Dr. Dosoretz is uncertain as to where the Defendants believe he has provided professional or administrative services and contends any administrative work he may have performed is not a basis for precluding him from working as a radiation oncologist in any location.

137.   The prohibition in Dr. Dosoretz's Noncompetition Agreement also provides that he may not "provide radiation oncology medical services of any kind to any patient referred to him, or his new employer, by any person that referred five (5) or more patients to the Employer during the twelve (12) months immediately preceding the end of his employment with the Employer[.]"  That provision, which applies even if Dr. Dosoretz did not in any way solicit the referral, extends far beyond reasonably protecting any legitimate business interest, infringes on the rights of patients and referring doctors alike, and is not presently enforceable.

138.   Yet another provision in his non-compete specifies that Dr. Dosoretz may not "employ any person employed or retained by the Employer (or any of its affiliated or related companies), whether that person is a full-time physician, part-time physician or independent contractor."  Because a separate provision states that Dr. Dosoretz may not "counsel, solicit, or attempt to induce" any person employed by 21st Century Oncology to terminate his or her employment with the company, the ban on employing any person who works at 21st Century Oncology arguably applies even to former employees of 21st Century Oncology, which Dr.

Dosoretz did not induce to leave the company, and as such, Dr. Dosoretz believes the prohibition is not presently necessary to protect any legitimate business interest and so is not enforceable.

139.    Plaintiffs believe these and similar restrictive provisions in Dr. Dosoretz's Noncompetition Agreement are presently overly broad, overly long in duration, not reasonably necessary to protect any legitimate business interest of 21st Century Oncology and, therefore are not enforceable as written.    Defendants believe the Noncompetition Agreement is fully enforceable.  Accordingly, based on all the facts and allegations as incorporated herein, there is an actual controversy among the parties with regard to the permissible temporal and geographic scope of these restrictive provisions, assuming that they are enforceable at all.

WHEREFORE, Plaintiff Dr. Arie Pablo Dosoretz seeks a declaration finding that the Dr. Dosoretz's restrictive covenant is not enforceable as written under Florida Statute 542.335 because it is overbroad, overlong and not reasonably necessary to protect any legitimate business interest. Dr. Dosoretz also seeks reasonable attorneys' fees, court costs, interest, and any other relief this Court deems proper

## COUNT V

### Declaratory Judgment under Fla. Stat. 542.335 as to Dr. Fox

140.    Plaintiffs repeat and reallege paragraphs 1 through 101 hereof, as if fully set forth herein.

141.    This is a declaratory judgment count brought under 28 U.S.C. § 2201 and 28 U.S.C. § 2202 for the purpose of determining an actual controversy among the parties regarding whether the restrictive covenants in the Fox Noncompetition Agreement running against Dr. Fox are presently overbroad, overlong and not reasonably necessary to protect legitimate interests of 21st Century Oncology.  Fla. Stat. § 542.335(1)(c).

142.    Plaintiffs believe the covenant not to compete against Dr. Fox in the Fox Noncompetition Agreement is overbroad and not reasonably necessary to protect any legitimate business interest and, therefore, is not presently enforceable.  Defendants believe it is enforceable.

143.    The covenant-not-to-compete running against Dr. Fox presently prohibits her from practicing within twenty miles of four specified offices or any other office where she has provided services on behalf of the employer.  The fact that the non-competition provision in the Rubenstein Employment Agreement governing Dr. Rubenstein has an exception or carve-out allowing Dr. Rubenstein to practice radiation oncology in one location of his own choosing, provided he does not practice with more than four other radiation oncologists and certain other conditions are met, demonstrates there is no legitimate business justification for a blanket prohibition on where Dr. Fox can practice and that there should, at a minimum, be a carve-out allowing her to practice in at least one location as well.

144.    The prohibition in the Fox Noncompetition Agreement also provides that she may not "provide radiation oncology medical services of any kind to any patient referred to her, or her new employer, by any person that referred five (5) or more patients to the Employer during the twelve (12) months immediately preceding the end of his employment with the Employer[.]"  That provision, which applies even if Dr. Fox did not in any way solicit the referral, extends far beyond protecting any legitimate business interest, infringes on the rights of patients and referring doctors alike, and is not enforceable.

145.    Yet another provision in the Fox Noncompetition Agreement provides that Dr. Fox may not "employ any person employed or retained by the Employer (or any of its affiliated or related companies), whether that person is a full-time physician, part-time physician or independent contractor."  Because a separate provision states that Dr. Fox may not "counsel,

solicit, or attempt to induce" any person employed by 21st Century Oncology to terminate his or her employment with the company, the ban on employing any person who works at 21st Century Oncology arguably applies even to former employees of 21st Century Oncology, which Dr. Fox did not induce to leave the company, and as such, Dr. Fox believes the prohibition is not necessary to protect any legitimate business interest and so is not enforceable.

146.    Plaintiffs believe these and similar provisions in the Fox Noncompetition Agreement are overly broad, overly long in duration, not reasonably limited to protect a legitimate business interest of 21st Century Oncology, and therefore, are not enforceable as drafted. Defendants believe the Fox Noncompetition Agreement is fully enforceable.  Accordingly, based on all the facts and allegations as incorporated herein, there is an actual controversy among the parties with regard to the permissible temporal and geographic scope of these restrictive provisions, assuming that they are enforceable at all.

WHEREFORE, Plaintiff Dr. Amy Fox seeks a declaration finding that the Dr. Fox's restrictive covenant is not enforceable as written under Florida Statute 542.335 because it is overbroad, overlong and not reasonably necessary to protect any legitimate business interest.  Dr. Fox also seeks reasonable attorneys' fees, court costs, interest, and any other relief this Court deems proper

## COUNT VI

### Declaratory Judgment under Fla. Stat. 542.335 as to Dr. Rubenstein

147.    Plaintiffs repeat and reallege 1 paragraphs 101 through hereof, as if fully set forth herein.

148.    This is a declaratory judgment count brought under 28 U.S.C. § 2201 and 28 U.S.C. § 2202 for the purpose of determining an actual controversy among the parties regarding whether

the restrictive covenant running against Dr. Rubenstein is overbroad, overlong and not reasonably necessary to protect legitimate interests.  Fla. Stat. § 542.335(1)(c).

149.    Plaintiffs believe the covenant not to compete against Dr. Rubinstein in the Rubenstein Employment Agreement is overbroad and not reasonably necessary to protect any legitimate business interest and so is not presently enforceable.  Defendants believe it is enforceable.

150.    The covenant not to compete in the Rubenstein Employment Agreement runs for three years after Dr. Rubenstein's termination date.  This time period is unreasonable under the facts and circumstance presented, and so is not enforceable.

151.    Plaintiffs believe the geographic scope of the restrictions in the Rubenstein Employment Agreement are also wrongfully overbroad.  It does not simply prohibit Dr. Rubenstein, who has worked for 21st Century Oncology in Lee County, from working as a radiation oncologist near a center where he has worked or even in a county where he has worked. Rather, it extends to: 1. Any hospital in which 21st Century Oncology physicians regularly admit patients; 2. Any county in which 21st Century Oncology or its affiliates operate a Center; 3. A radius of twenty-five (25) miles of any 21st Century Oncology location providing radiation oncology services.

152.    While there is a limited exception that allows Dr. Rubenstein to practice radiation oncology in one location as part of a group practice of five (5) or less radiation oncologists, provided certain other conditions are met, the exceedingly broad scope of his non-competition agreement is not reasonably necessary to protect a legitimate business interest of the Defendants and so Plaintiffs believe that his broad non-competition agreement is not enforceable.

153.    That limited exception or carve-out provides that even if Dr. Rubenstein is practicing in a single office with no more than five radiation oncologists, he or his physician group or practice may not have "affiliated relationships with any other physician practices[.]"  The meaning of that phrase is not clear, but if it is interpreted to mean he cannot practice in a group that employs doctors other than radiation oncologists, the prohibition is not necessary to protect any legitimate business interest, and it also makes his carve-out illusory because it is not possible to compete against 21st Century Oncology in a group composed solely of radiation oncologists.

154.    Plaintiffs believe these and similar provisions in Dr. Rubenstein's covenant not to compete are overly broad, overly long in duration, not reasonable and so are not presently enforceable.  Defendants believe the restrictions in the Rubenstein Employment Agreement are fully enforceable.  Accordingly, based on all the facts and allegations as incorporated herein, there is an actual controversy among the parties with regard to the permissible temporal and geographic scope of these restrictive provisions, assuming that they are enforceable at all.

WHEREFORE, Plaintiff Dr. James H. Rubenstein seeks a declaration finding that the Dr. Rubenstein's restrictive covenant is not enforceable as written under Florida Statute 542.335 because it is overbroad, overlong and not reasonably necessary to protect any legitimate business interest.  Dr. Rubenstein also seeks reasonable attorneys' fees, court costs, interest, and any other relief this Court deems proper

## COUNT VII

### Declaratory Judgment under Fla. Stat. 542.335 as to Dr. Katin

155.    Plaintiffs repeat and reallege paragraphs 1 through 101 hereof, as if fully set forth herein.

156.    This is a declaratory judgment count brought under 28 U.S.C. § 2201 and 28 U.S.C. § 2202 for the purpose of determining an actual controversy among the parties regarding whether the restrictive covenant in the Katin Employment Agreement running against Dr. Katin is overbroad, overlong and not reasonably necessary to protect legitimate interests.  Fla. Stat. § 542.335(1)(c).

157.    Plaintiffs believe the covenant not to compete against Dr. Katin is overbroad, overly long, and not reasonably necessary to protect any legitimate business interest and so is not enforceable as drafted.  Defendants believe it is enforceable.

158.    The covenant not to compete in the Katin Employment Agreement runs for three years after Dr. Katin's termination date.  This time period is unreasonable under the facts and circumstances presented, and so is not enforceable.

159.    Plaintiffs believe the scope of the geographic restrictions in the Katin Employment Agreement are also wrongfully overbroad.  The restriction does not simply prohibit Dr. Katin, who has worked for 21st Century Oncology in Lee and Charlotte Counties, from working as a radiation oncologist near a center where he has worked or even in a county where he has worked.  Rather, it extends to: 1. Any hospital in which 21st Century Oncology physicians regularly admit patients; 2. Any county in which 21st Century Oncology or its affiliates operate a Center; or 3. A radius of twenty-five (25) miles of any 21st Century Oncology location providing radiation oncology services.

160.    The fact that non-competition provision in the Rubenstein Employment Agreement governing Dr. Rubenstein has a carve-out allowing Dr. Rubenstein to practice radiation oncology in one location of his choosing, provided he does not practice with more than four other radiation oncologists and certain other conditions are met, demonstrates there is no legitimate business

justification for a blanket prohibition on where Dr. Katin can practice and that, at a minimum, there should be a carve-out allowing him to practice in at least one location as well.

161.    The non-compete in the Katin Employment Agreement not only prohibits Dr. Katin from practicing as a radiation oncologist, it also provides he may not "interfere or disrupt or attempt to interfere or disrupt, the relationships between the Company Group and/or any of its joint ventures and any patient, referral source or supplier or any other person having business relationships with the Company Group and/or any of its joint ventures." That prohibition is replete with undefined terms that are extraordinarily vague and encompassing, and that prohibition is not enforceable because it is not reasonably necessary to serve any legitimate business purpose.

162.    Yet another provision in his non-compete provides that Dr. Katin may not "solicit, induce or hire, or attempt to solicit, induce or hire, any employee of the Company Group and/or any of its joint ventures[.]"  The prohibition on hiring any employee of the "Company Group" appears to apply even to former employees of 21st Century Oncology, whom Dr. Katin did not solicit or induce to leave the company, and as such, Dr. Katin believes the prohibition is not necessary to protect any legitimate business interest and so is not presently enforceable.

163.    Plaintiffs believe these and similar provisions in the Katin Employment Agreement are overly broad, overly long in duration, not reasonably limited to protect a legitimate business interest of 21st Century Oncology and, therefore, are not presently enforceable.   Defendants believe the restrictions in the Katin Employment Agreement are fully enforceable.  Accordingly, based on all the facts and allegations as incorporated herein, there is an actual controversy among the parties with regard to the permissible temporal and geographic scope of these restrictive provisions, assuming that they are enforceable at all.

WHEREFORE, Plaintiff Dr. Michael J. Katin seeks a declaration finding that the Dr. Katin's restrictive covenant is not enforceable as written under Florida Statute 542.335 because it is overbroad, overlong and not reasonably necessary to protect any legitimate business interest. Dr. Katin also seeks reasonable attorneys' fees, court costs, interest, and any other relief this Court deems proper

## PRAYER FOR RELIEF

Award to Plaintiffs their costs of suit, including reasonable attorneys' fees and expenses, pursuant to 15 U.S.C. §15(a);

Declare that Defendants, their directors, officers, parents, employees, agents, successors, members, and all persons in active concert and participation are violating Section 2 of the Sherman Act through their anticompetitive practices as alleged herein, both because they have illegally monopolized the market for radiation oncology services in these three counties and in the alternative because they have a dangerous probability of doing so;

Declare that the non-compete agreements of Doctors Dosoretz, Fox, Rubenstein, and Katin are not enforceable, or in the alternative restrict the temporal and geographic scope of those overbroad, overlong and unreasonable agreements;

Award to Plaintiffs their costs of suit, including reasonable attorneys' fees and expenses, under their restrictive covenants;

and Award any other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiffs demand a Jury Trial on all issues so triable.

Dated:  March 15, 2019

Respectfully submitted,

/s/ Luis E. Suarez
*Luis E. Suarez*

Ernest J. Marquart
Florida Bar No. 905860
emarquart@shumaker.com
Thomas M. Wood
Florida Bar No. 10080
twoods@shumaker.com
Michele Leo Hintson
Florida Bar No. 604941
mhintson@shumaker.com
**SHUMAKER, LOOP & KENDRICK**
101 East Kennedy Boulevard, Suite 2800
Tampa, Florida 33602
Telephone:  (813) 229-7600
Facsimile:  (813) 229-1660

Luis E. Suarez
Florida Bar No. 390021
lsuarez@bsfllp.com
Mark J. Heise
Florida Bar No. 771090
mheise@bsfllp.com
**BOIES SCHILLER FLEXNER LLP**
100 Southeast Second Street, Suite 2800
Miami, FL  33131
Telephone:  (305) 539-8400
Facsimile:  (305)539-1307

STUART H. SINGER, ESQ.
Florida Bar No. 377325
Carl E. Goldfarb,
Florida Bar No. 125891
cgoldfarb@bsfllp.com
**BOIES SCHILLER FLEXNER LLP**
401 East Las Olas Blvd., Suite 1200
Fort Lauderdale, Florida  33301
Telephone:  (954) 356-0011
Facsimile:  (954) 356-0022

*Attorneys for Plaintiffs*